# In re: Appeal of Pittsburgh Terminal Coal Corporation.

*Taxation—Coal lands—Improvements—Value of improvements—Assessment.*

Where coal property has been assessed as opened and improved coal acreage the value of the shafts leading into it is included and reflected in the valuation placed upon the coal itself. Additional and separate values cannot be placed upon the shafts themselves.

Argued April 25, 1927. Appeal No. 3, April T., 1927, by Pittsburgh Terminal Coal Corporation from order of C. P. Allegheny County, April T., 1925, No. 1773, in the case of In re: Appeal of Pittsburgh Terminal Coal Corporation, a corporation of Pennsylvania, from the decision of the Board for the Assessment and Revision of Taxes of Allegheny County. Before HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ. Reversed.

Appeal from assessment of taxes by Board for the Assessment and Revision of Taxes for Allegheny County. Before REID, J.

The facts are stated in the opinion of the Superior Court.

The Court affirmed the opinion of the Board. Petitioner appealed.

*Error assigned,* among others, was the judgment of Court.

*Daniel M. Evans,* and with him *Horace F. Baker,* for appellant.

*William C. Jacob,* and with him *W. Heber Dithrich,* for appellee.

OPINION BY CUNNINGHAM, J., October 7, 1927:

At the triennial assessment in 1925 of real estate for county purposes the Board for the Assessment

and Revision of Taxes for Allegheny County placed a valuation of $1,511,130 on 3,721.39 acres of the Pittsburgh vein of coal in Bethel Township, owned by the Pittsburgh Terminal Coal Corporation, appellant herein, and in addition thereto assessed three shafts opening into said coal in amounts aggregating $59,000. The surface owned by the coal company in this township was separately assessed at $175 per acre; the tipples over the shafts and the machinery in them were also included as separate items in the total valuation and are not here involved. The company, contending that this coal was assessed as opened and developed coal and that whatever value the shafts might have was in fact included and reflected in the valuation placed upon the coal itself, and that they could not, therefore, legally be added as separate items in the total assessment, appealed to the Court of Common Pleas of Allegheny County and prayed that the items for the shafts be stricken from the valuation. That court, after a hearing, dismissed the appeal and affirmed the assessment as made by the board; hence this appeal by the company.

A reference to the history of this litigation is essential to a correct disposition of the present appeal. In 1923 appellant owned 3,939.68 acres of this seam of coal in said township and the board in making a valuation of its property assessed one hundred acres in the immediate vicinity of two of the shafts in question in this case at $650 and the remaining 3,839.68 acres at $400 per acre, making a total assessment for the coal of $1,600,872, and then assessed as additional and separate items two of the shafts at an aggregate sum of $50,000. Upon appeal to the Court of Common Pleas of Allegheny County that court struck off, among other items involved in that case, the $50,000 for the shafts, and the board appealed to this court: Appeal of Board for the Assessment and Revision of Taxes for Allegheny County, 83 Pa. Superior Ct. 535.

The action of the Court of Common Pleas with respect to this item was affirmed but upon grounds other than those stated by the court below which held that the shafts were nothing but two holes in the ground and as such could not be made the subject of separate items in the assessment. Upon that appeal this court, in an opinion written by Judge GAWTHROP, held, citing Guthrie v. Pittsburgh Dry Goods Co., 47 Pa. Superior Ct. 384, 400, [a case in which a factory building, the machinery therein, and the land upon which it was erected were assessed as separate items], that the integrity of an assessment is not affected by an enumeration of the elements entering into the aggregate of the valuation and the placing of a separate value on each, and said: "We do not hold that the mine shafts, which were an element proper to be considered in fixing the total assessments, could not be valued and assessed as a separate item. ....... It appears from the facts agreed upon that without the two shafts the entire acreage of the company would be assessable as unimproved, inactive coal lands at the fixed assessable rate of $400. From this and the fact that the one hundred acres immediately surrounding the shafts were assessed at $650 per acre, that being the fixed assessable rate for improved, active coal acreage, it is clear that whatever value these shafts have as part of the coal acreage was assessed and is reflected in the valuation of that land. Therefore the shafts could not be considered again as a separate item in fixing the total assessment and their valuation in a separate item was improper." To what was there said we may add that there is a distinction between those items or elements legally and logically entering into the aggregate of a valuation which have an intrinsic value of their own (for instance, a privately-owned branch railroad, Cowanshannock C. and C. Co.'s Tax Assessment, 283 Pa. 122), and those which have little or no intrinsic value but because of their location and use add to

the value of a complete property.  A coal acreage with shafts, drifts, entries or ways of any kind opening into it is manifestly more valuable than an undeveloped one but the increase in value attaches to the mine itself by reason of the existence of such openings. "The integrity of the assessment" of an opened coal acreage would probably not be affected if the coal were assessed as unopened and undeveloped coal and then the additional value which it has by reason of being opened assigned to the openings.  As stated by our Supreme Court in Cowanshannock C. and C. Co.'s Tax Assessment, supra, consideration should be given in determining the taxable value of a coal property to the elements which have a tendency to give market value, and privately-owned railroads, tipples, shafts and improvements which could not be taken from it without destroying it as a mining proposition are there mentioned as such elements.  The underlying question in this case is, therefore, whether the value which these shafts add to appellant's coal acreage was in fact included in the valuation placed upon the coal itself, that is, whether the coal was assessed as "improved, active coal acreage," or as "unimproved, inactive coal lands": Appeal of Board for the Assessment and Revision of Taxes for Allegheny County, supra.  If it was assessed as improved coal acreage then, as distinctly held in that case, "the shafts could not be considered again as a separate item in fixing the total assessment."

The effect of that decision is that when coal acreage is assessed as "improved," separate items may not be included for the shafts which make it improved.  As this was a triennial assessment there is also involved incidentally the question whether the board intended to then make any increase in the valuation of this vein of coal in Bethel Township.  The undisputed evidence leaves us in no doubt upon these questions.  The shafts assessed as separate items are perpendicular ways,

36 x 12 feet, leading from the surface to the coal 350 feet beneath, and form continuations of the entries through the coal; they are placed underneath the tipples; are built of concrete and brick and are used for general ingress and egress to and from the mine and for the purpose of bringing out coal and admitting air for ventilation. For the year 1924 the property was assessed upon the 1923 basis of $650 per acre for the one hundred acres in the vicinity of the shafts and $400 for the more remote acreage and in compliance with the decision of this court no separate items were included that year for shafts. Returning for a moment to the assessment for 1923, the evidence in this case shows that the entire amount of coal that year was 3,939.68 acres, of which one hundred acres were assessed at $650 and 3,839.68 at $400 per acre, making a total of $1,600,872, or an average rate of approximately $406.50 per acre if the coal acreage be considered as a whole. During the year 1924 appellant mined 234 acres of coal, thereby reducing its holdings to approximately 3,705 acres.

At the triennial assessment in 1925 the board discarded the method theretofore prevailing in the assessment of opened and improved coal lands, viz: the placing of a higher value per acre upon the coal in the vicinity of the openings, and substituted therefor the plan of assessing the total coal acreage in bulk. Hence, for the year 1925 the item in appellant's assessment relating to the coal alone reads "3,721.39 A Pgh. Vein Coal, $1,511,130." This assessment is at the rate of approximately $406.50 per acre and the result would have been precisely the same if one hundred acres in the vicinity of the shafts had been assessed at $650 and the remaining acreage at $400 per acre. In addition the board added as separate items one shaft at the main tipple of this mine at $30,000, another at the manhole at $20,000 and a shaft at the tipple of mine No. 3 at $9,000, or a total of $59,000 for shafts.

On the question whether the valuation of $1,511,130 was for improved coal acreage Mr. Eades, the chief property assessor in the tax revision board, testified: "Q. Now, Mr. Eades, was the Pittsburgh Terminal Coal land improved coal land. or unimproved? A. I would say those lands were improved. Q. And they are all assessed as improved coal lands, is that right? ...... A. Well, we do not designate them improved or unimproved, but as so many acres. Q. But you would say it was all improved coal, that is what you did say, isn't it? A. I said they were active in the coal business. That is what I am trying to say. They were not lying dormant. They were in the coal business in an energetic way. Q. Well, now, Mr. Eades, the opening in the coal land was part of that improvement—they are the improvement aren't they? A. The openings and the railroad facilities and everything of that sort that would make it a going concern. ...... Q. And the accessibility? A. Yes, of course. Q. The openings—that would be accessibility—openings would mean accessibility, isn't that right, with respect to coal lands? A. Yes, I would so understand it. ...... We discarded the theory of openings and all that sort of thing, and directed the assessors to assess the bulk acreage at a certain all around price, which is the same as we would— ...... Q. And accessibility would reflect in the value which you fix on the coal acreage, wouldn't it? A. Well, yes, I would say it would."

With relation to the question whether the board intended at the triennial assessment for 1925 to make any increase in the valuation of appellant's coal property as a whole it was admitted that prior to that year the assessments against the various owners of the Pittsburgh seam of coal in Bethel Township had been made uniformly at $400 and $650 per acre as above indicated. That the board did not intend to make any increase in the valuation of coal properties in that township at this triennial assessment is entirely clear

from the testimony of Mr. Eades: "Q. Were the values appearing in these assessments increased this year? A. No, they were not, but the— ........ Q. I understood you to say that the coal rates were not increased in value, is that right? A. Yes, but that really does not tell the whole story. Q. Mr. Eades, isn't it a fact that no coal properties in the land [county] were increased this year in value, owing to the fact that the coal industry was in a very bad condition? ...... A. Well, they weren't in this particular locality. Now, there may be cases— ........ Q. And the actual value of coal lands bordering right on it, in the same township, was not raised? A. No, no. Q. So that, assuming, Mr. Eades, that there had not been any mining of coal—no coal had been mined out by the Pittsburgh Terminal Coal Corporation in the year of 1924, the value of the Pittsburgh Terminal Coal properties for 1925 assessments would have been this figure here (indicating), that is, $1,600,870. [3,939.68 acres at $406.50 per acre.] Is that right? A. Yes."

The following excerpt from the opinion of the learned judge of the court below seems to indicate that this material testimony was inadvertently overlooked. "It must be remembered that the assessment now in question was the triennial one, made at a period fixed by law, at which the subject of values, methods and all the facts essential to due and legal assessments for taxation purposes are taken up *de novo* and acted upon with a view of continuing the result obtained in force until the next stated period. There is nothing unfair or illegal in the Board's undertaking to adopt a new and perhaps more reasonable basis of valuation at this triennial period." That the board had the legal right to increase appellant's assessment at this triennial period and that it would have been justified in so doing under the evidence relative to market value may be conceded; but it has expressly repudiated any such intention. The only thing which prevented the

assessment in 1925 of the coal alone, under the new method adopted that year by the board, from being the exact amount of its valuation in 1923, under the former method, was the mining of 234 acres in 1924. The addition to an assessment, so clearly based upon the fact that the coal acreage is opened, accessible and active, of separate items for the shafts which make it accessible, was directly and positively declared to be illegal in the prior decision of this court. It is perfectly obvious that if the board had acted in accordance with its declared intention of merely changing its method of assessment without increasing the valuation-and its professed desire to comply with the decision of this court, it would have assessed the coal at $400 per acre and then added proper items for the shafts. The professions of the board with respect to its intentions are contradicted by its acts. In so far as these shafts are concerned, their value is clearly included and reflected, under all the evidence, in the valuation placed upon the coal itself as opened, improved and active coal acreage but the board has also placed an additional and separate valuation upon them. This cannot legally be done.

The assignment of error is sustained; the order of the court below dismissing the appeal is reversed; the appeal is reinstated and it is directed that the items for shafts in appellant's assessment in Bethel Township for 1925, aggregating $59,000, be stricken therefrom.